Madden, Judge,
delivered the opinion of the court:
The original plaintiff died in 1953. The suit is now,prosecuted by his executors. The word plaintiff as used herein, will refer to the original plaintiff. This suit is for retired pay. Eetired pay to the plaintiff as a Reserve officer disabled in line of duty was awarded and paid for a time, but the award was later revoked and payment was discontinued. This suit seeks to recover retired pay from the date of the discontinuance to the date of plaintiff’s death.
After youthful service with the British Army from 1915 to 1918, the plaintiff was commissioned in the Officers’ Reserve Corps of the Army of the United States in 1919. In March 1938 he was a captain, Quartermaster Corps Reserve, and was ordered to active duty with the Civilian Conservation Corps. In May of 1938 he became ill and was taken to Walter Reed General Hospital. There the first diagnosis of his ills was (1) sciatica, (2) arthritis, and (3) valvular heart disease. The condition of his heart caused much discussion in the Walter Reed staff. Major Best, the plaintiff’s ward officer, thought the trouble was valvular, but Lt. Col. Berle, the cardiologist, thought it was a form of neurocirculatory asthenia which is not a serious heart disease, but a mere functional disorder of the heart. On July 28, 1938, the plaintiff appeared before an evaluation board, Major Best being the only medical witness. He had changed his opinion, and upon his testimony, the board diagnosed the plaintiff’s condition as “neuro-circhlatory asthenia, mild.” A disposition board, of which Major Best was also a member, met on August 30, 1938, and made the same diagnosis. It found the plaintiff, physically fit and recommended his return to duty. These findings were duly approved.
For some reason which, does not appear in the record, the plaintiff was, on September 20, 1938, reported as not physically qualified for active duty and was transferred to the Inactive Reserve Section of the Officers’ Reserve Corps. He was awarded disability benefits by the Veterans’ Administration on the basis of thirty percent combined disability, *479 ten percent of which was attributable to neurocirculatory asthenia.
In February 1939 the plaintiff requested that a summary of his medical record be sent to his personal physician. The Adjutant General of the Army sent such a report. In it, no mention was made of valvular heart disease. The report concluded “In view of these facts it was believed that the evidence was insufficient to make a diagnosis of organic heart disease.”
The plaintiff and his physician thereafter believed that, he did not have heart disease in 1938.
The plaintiff lived actively and normally from the time of his transfer to the Inactive Eeserve. After Pearl Harbor, he requested reinstatement to active duty. He was given a medical examination, the medical examiner having been advised of the defects for which he had been transferred to the Inactive Eeserve, viz, sciatica, arthritis, and neurocirculatory asthenia. His medical report was satisfactory and it reported his heart as “normal.” It was sent to the War Department which directed a further examination, including X-ray and cardiogram, and a report as to whether there was evidence of organic heart disease or neurocirculatory asthenia. After this examination, the medical examiner reported, “There is no evidence of heart disease or neuro-circulatory asthenia.”
The War Department ordered the plaintiff to extended active duty effective April 4-, 1942, in orders which noted that he was physically qualified. When he received these orders, he discovered errors in the report of his physical examination and reported the errors in a letter to the competent commander. One of the errors was a statement that he was not receiving disability compensation. The plaintiff reported that he was receiving such compensation, for the disabilities for which he had been placed in the Inactive Eeserve in 1938. He was advised that he must relinquish his disability compensation, and he so advised the Veterans’ Administration.
The plaintiff served creditably in the Army, and was promoted to the rank of major. In May of 1945, he suffered a heart attack and in October was sent to the Eegional Hospital at Camp Lee, Virginia, where a medical board and a disposi *480 tion board both diagnosed his illness as valvular heart disease. Th8 disposition board designated his primary disease as having been incurred in the line of duty. The medical board made no statement in that regard, that not being, apparently, within the scope of its functions. The disposition board recommended that the plaintiff appear before an army retiring board which he did at Camp Lee on January 22, 1946. Both the medical witnesses before the board testified that in their opinion the plaintiff’s disabilities had existed before he entered service, but that they had been aggravated by service, and hence, were incurred in line of duty. The board found that the plaintiff was permanently incapacitated for active service by reason of valvular heart disease and arteriosclerosis. He was thereupon relieved from active duty and ordered home.
On review of this decision, action on the foregoing findings was held in abeyance and the plaintiff was recalled to active duty at Walter Eeed Hospital for further observation and treatment. He was admitted there on April 22, .1946. On June 10, he appeared before a new disposition board and on June 20 before a new medical board. He told both boards that at the time he entered active service a question had been raised about the condition of his heart, and X-rays and an electrocardiogram had been required. Both boards diagnosed the plaintiff’s disabilities as valvular heart disease and neurotic depressive reaction, and held that both were incurred in line of duty.
On July 9,1946, the plaintiff appeared before an Army retiring board at Walter Eeed Hospital. That board was given the same information as the prior boards, and made the same decision. Its findings were duly approved and the plaintiff was certified to the Veterans’ Administration for retired pay, effective July 24,1946.
In May 1947, the Veterans’ Administration sent the Adjutant General’s Office a letter stating that the plaintiff had been paid disability compensation, beginning in 1938 in consequence of his Civilian Conservation Corps service, on the basis of a thirty-percent combined degree of disability, ten percent of which was attributable to neurocirculatory asthenia. The letter enclosed a summary of the records of the plaintiff’s 1938 Walter Eeed hospitalization, which *481 showed as we have seen, that his trouble was originally diagnosed as valvular heart disease, but later and finally as neuro-circulatory asthenia. These papers, together with such papers as were in the plaintiff’s personnel file in the Adjutant General’s office, were forwarded to the Surgeon General. They came to the desk of Lt. Col. Jacobs, Medical Corps, who was then on duty in the Retirement Branch, Physical Standards Division, of the Surgeon General’s office. The file which was before him did not contain the Adjutant General’s letter to the plaintiff’s physician advising that the plaintiff did not have organic heart disease, nor the letters written at the time of the plaintiff’s entry into active service showing that the condition of the plaintiff’s heart had been given particular attention at that time, because of his having been placed in the Inactive Beserve in 1938 because of ailments, including neurocirculatory asthenia.
Without obtaining the rest of the available information, Lt. Col. Jacobs prepared a communication, later sent on behalf of the Surgeon General, to the Adjutant General, stating that “The latest evidence in the record reveals that officer had valvular heart disease diagnosed at Walter Eeed General Hospital in 1938 while on CCC duty”; that “There is evidence of apparent fraud in that officer failed to reveal the duration of his heart disease and that he was receiving 30% pension from YA, beginning October 1938, when asked duration of his disability.” He recommended that the case be reopened.
This communication was referred by the Adjutant General to the Secretary of War’s Personnel Board. That board, on July 8,1947, wrote the Adjutant General that in its opinion the findings of the Walter Eeed Retiring Board might have been materially different if the plaintiff’s complete medical records had been available to it, and it directed, in the name of the Secretary of War, that the findings of the retiring board be disapproved. Two days later, the War Department advised the plaintiff that new evidence not previously available had come to light; that if this evidence had been available to the retiring board, the findings of the board and the action of the War Department would have been materially influenced thereby; that the plaintiff was not *482 entitled to retired pay. The letter tendered the plaintiff the opportunity of being recalled to active duty at the Walter Eeed Hospital and appearing before a new retiring board.
The plaintiff replied, asking what the new evidence was. The War Department’s reply summarized the 1938 Walter Eeed Hospital information, including the fact that the May diagnosis of valvular heart disease had been changed on July 20 to read “Neurocirculatory asthenia, mild, cause undetermined.” In a second paragraph it gave the plaintiff the apparently irrelevant information that disabilities incurred while serving with the Civilian Conservation Corps were not a basis for retirement pay.
The plaintiff, through counsel, made several written requests to have his retired pay reinstated. In a letter of July 14,1948, he furnished the Adjutant General copies of letters not then in the Army files, including the Adjutant General’s letter to the plaintiff’s physician, and the letters written by the Army at the time of the plaintiff’s entry into active service. The Adjutant General replied on September 27, 1948, stating that if all the evidence had been available, different findings might reasonably have been reached to the effect that the plaintiff was not entitled to retired pay; that therefore the case had been reopened and the findings of the retiring board disapproved. The letter further stated:
Major Loth’s entire record has again been carefully reviewed in the Office of The Surgeon General resulting-in the expressed view that he is permanently incapacitated for active service by reason of valvular heart disease but that this incapacity resulted from a natural progression of a defect which antedated his entrance on active duty in World War II (4 April 1942) and, consequently, is not the result of an incident or the service.
This quoted statement not only reopened the case but re-closed it adversely to the plaintiff. The prior communications and, indeed, this one, had said that on the basis of the additional evidence, a retiring board might reasonably have reached a different conclusion, but the quoted language shows that the conclusion had been reached.
The Adjutant General’s letter went on to say that actions of the department to date had left two matters undecided. It said that no army retiring board to date had considered the *483 case from the standpoint of possible aggravation of the disease while in the service. This statement was erroneous. All the medical testimony before the Camp Lee Betiring Board had been to the effect that the plaintiff’s condition must have, in the nature of things, had its origin before entry into service, but that it had been aggravated by the service and hence was incurred in the line of duty.
The other matter left undecided according to the Adjutant General’s letter, was as to the neurotic depressive reaction, which had been found as an additional disability by the Walter Eeed Eetiring Board. The board had found that disability, along with the valvular heart disease, to be service-connected. That finding had been approved. The new evidence seems to have had nothing to do with that. Yet it was set aside along with the finding about the heart disease.
The Adjutant General then offered to the plaintiff the opportunity, at his own expense, to enter Walter Eeed Hospital for further observation, necessary treatment, appearance before a disposition board and, if indicated, before a new Army retiring board. He further suggested that the plaintiff had a right to request a review of his case by the Army Disability Beview Board at any time within fifteen years, and enclosed appropriate forms for such a request.
It is, to say the least, doubtful whether the Disability Be-view Board would have had the power to give the plaintiff any relief. He had not been released from active service, without pay, for physical disability pursuant to the decision of a retiring board, as the statute specified. Sec. 302 (a) of the Servicemen’s Eeadjustment Act of 1944,38 U. S. C. (1952 ed.) 693 i. The board’s decision had been favorable and he had no objection to its findings. Furthermore, until the Supreme Court’s denial of certiorari, 345 U. S. 994, June 15, 1953, in this court’s cases of Frame, Ramsey, and Thomas, 124 C. Cls. 557, 830, 833, even if the Disability Beview Board decided favorably to the officer, he was not paid for the time: during which he was wrongfully denied his retired pay.
The plaintiff’s counsel urges many reasons for a favorable* decision, and it would be interesting and instructive to consider them all in detail. But among these reasons, the dominant one is, we think, that the plaintiff did not receive fair *484 treatment, due process of law. The reason, which perhaps was an excuse, so far as attributing any personal culpability for some of the conduct in this case, must lie in the great numbers of persons and documents with which the officials concerned had to deal. But when an individual comes into court and asserts his rights, the court should not deny him those rights because other officials who have previously dealt with him were too pressed with work to give careful consideration to his claim.
It was completely unfair to nullify the plaintiff’s right to retired pay without any semblance of notice or hearing. He was thus thrown back to the foot of the ladder which he had laboriously climbed. The action was taken hastily and without any effort to gather the relevant evidence. The evidence which it was the Department’s practice and its agents’ duty to gather before taking action deeply injurious to the plaintiff would have, we think, convinced anyone who weighed the evidence before he acted, that there was no good ground for the action. When an officer who had been most meticulously examined in 1942 with regard to the condition of his heart had been found fit for active service in the Army, had actively served for three years and then broken down with heart disease, what possible difference could it have made that in 1938 a preliminary diagnosis, later recanted by the only medical officer who made it, had attributed heart disease to him. The medical officers who testified before the Retiring Board at Camp Lee said that the disease, in some degree, must have antedated the plaintiff’s entry into service in 1942. Yet that board, in its formal finding, said that the disability was incurred in the line of duty. Obviously, what they meant was that it became disabling in the course of and because of the service. We suppose that the last retiring board at Walter Reed thought of it in the same way, since they had the same medical history before them.
According to the Adjutant General’s letter of September 27, 1948, the Surgeon General’s office was willing and able to take the responsibility for supplanting the retiring board and deciding adversely to the plaintiff, that his heart disease had not been incurred in the service. Why could they not equally have decided in his favor that it had been aggravated *485 by bis service ? Was it supposed that incipient heart disease so slight in 1938 that, after weeks of observation in one of the best facilities in the country, it was definitely ruled out; which, during more than three years of active civilian life, did not reappear; which, upon careful examination on entry into active service in 1942, could not even be detected; would in its normal progress lay a man low in 1945 ?
The Government urges that we should not consider and decide the plaintiff’s case because he did not exhaust his administrative remedies. It concedes that there was no statutory requirement that the plaintiff should take the additional procedural steps which the Adjutant General prescribed in his letter. It urges rather, that in our discretion, and for the sake of orderly governance, we should send him back to the executive department. Our discretion pulls strongly in the other direction in this case. The plaintiff was given the opportunity, at great expense to himself, to once more fight his way up through a disposition board and a retiring board to a review by the Surgeon General’s office. But that office had already decided that the plaintiff’s disease was not incurred in the service, had disregarded the medical testimony that it was aggravated by his service; had set aside, for no apparent reason, the retiring board’s finding of a second, service incurred, disabling disease, neurotic depressive reaction which had led the officer to attempted suicide. We think the plaintiff was not unreasonable in concluding that the quest for relief in the department was a most unpromising speculation which he was not willing to undertake.
The plaintiff’s executors are entitled to judgment. Entry of judgment will be suspended, as stated in our conclusion of law.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and JoNss, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner George H. Foster, and the briefs and arguments of counsel, makes findings of fact as follows:
*486 1. Margaret R. Loth and Carl C. Loth are the duly substituted coexecutors of the last will and testament of William Jefferson Loth, Jr., who is hereinafter referred to as plains-tiff, and who during his lifetime was a citizen of the United States of America and of the Commonwealth of Virginia. He was born in Waynesboro, Virginia, on August 17, 1892, and died in Staunton, Virginia, on April 9,1953.
As a boy, plaintiff attended school in Virginia, at first private schools near his home, and later at Orange and Lexington, Virginia. Sometime during his teens he suffered a chorealike attack and he missed some time at school, particularly from about September 1908 to January 1909, and from Eastertime 1909 to September 1909.
In the spring of 1915, while attending Cornell University, he left to enlist in the British Army and served with the British Forces until the middle of 1918.
2. Plaintiff was first commissioned in the Officers’ Reserve Corps of the Army of the United States on October 4,1919, and for many years thereafter continued to be a Reserve commissioned officer of the Army of the United States. Prior to April 15, 1938, plaintiff had been on active duty for 14 days’ training periods in the summers of 1935 and 1936. On March 22, 1938, being then a captain, Quartermaster Corps Reserve, plaintiff was ordered to active duty with the Civilian Conservation Corps for a period of six months, effective April 15, 1938. A report of physical examination, executed at Headquarters Central District, Civilian Conservation Corps, Towson, Maryland, on April 15, 1938, the date he entered on active duty, showed that plaintiff’s physical condition was normal and that it met all requirements. The report showed: “cardiovascular system — normal; heart — normal.”
3. Plaintiff was taken ill May 26, 1938, in his quarters at Towson, Maryland, and on May 27 and May 31, was seen by a medical officer on duty. On the latter day his condition had worsened, and in the evening of May 31, 1938, he was admitted to Walter Reed General Hospital in Washington. The complaint at the time was “severe pain, left hip region and muscles of left leg; malaise, general weakness.”
*487 Following plaintiff’s admission in Walter Need General Hospital, it developed that plaintiff was suffering from something other than the complaint for which he was admitted. During his stay at the hospital, there was considerable difference of opinion and discussion among the doctors as to the cardiac condition of plaintiff. On June 20, 1938, a diagnosis was made as follows:
(1) Sciatica, acute, left, mild, cause undetermined;
(2) Arthritis, chronic, hypertrophic, moderate, involving lumbar spine, sacroiliar and hip joints, bilateral, cause undetermined;
(3) Valvular heart disease, mitral stenosis and regurgitation, rheumatic in origin.
Plaintiff remained at Walter Need General Hospital as a patient for over three months, until September 2, 1938. During this time, he was thoroughly examined. X-rays, fluoroscopes, and electrocardiograms were taken, and he was seen by consultants on duty at the hospital. On July 31, 1938, it was noted in plaintiff’s clinical records that his “cardiac condition has caused a great deal of discussion among members of the staff. No note of a murmur was made on his physical examination prior to entrance on active service and yet it is impossible to feel that murmurs heard are of recent origin. Patient denies rheumatic history by name and symptom, and yet we know that at one time he had an EKG taken (which he states was at insistence of wife), and mother states that as a child he missed a great deal of school because of St. Vitus dance.”
4. On July 28,1938, a board of three medical officers convened under paragraph 2e (1), Army Regulations 35-3420, dated September 23, 1937, to inquire into plaintiff’s condition. After hearing the plaintiff and examining his medical records, this board changed diagnosis 3, set out in finding 3, to read:
(3) Neurocirculatory Asthenia, mild, cause undetermined.
It further found, referring to all the diagnoses, as amended, “That diagnosis No. 1 of Sciatica, acute, left, mild, was in line of duty; that diagnoses Nos. 2 and 3 are not in line of *488 duty and existed prior to entrance on active duty with tbe Civilian Conservation Corps.”
Thereafter, on August 30,1938, plaintiff met a disposition board, composed of the chiefs of the medical and surgical services at Walter Reed General Hospital. The disposition board confirmed the diagnosis of neurocirculatory asthenia made by the board convened under Army Regulations 35-3420, noting that “the evidence is insufficient to make a diagnosis of organic heart disease at this time.” The board also found that plaintiff “is physically fit for the performance of full military duty,” and recommended that he be relieved from further observation and treatment and returned to a duty status. The findings of the disposition board were approved by the commanding general, Walter Reed General Hospital, on September 1, 1938. The diagnosis of “Neuro-circulatory asthenia, mild” was the final diagnosis made by the Army medical authorities at Walter Reed General Hospital. Plaintiff was returned to active duty September 2, 1938.
The term “heart disease,” without more, generally means, in medical usage, organic heart disease. Neurocirculatory asthenia is not organic heart disease, but is a functional disorder. It is a cardiovascular manifestation of anxiety. In neurocirculatory asthenia, the patient complains of his heart. If the ailment is uncomplicated, the heart is organically sound; there are no pathological changes; the patient has no tendency to die prematurely or to develop organic heart disease; and the prognosis is excellent as to life. In the treatment of neurocirculatory asthenia, it is necessary and important to dispel any fear of heart disease on the part of the patient. To distinguish between uncomplicated neuro-circulatory asthenia and heart disease is one of the most complicated and difficult problems in cardiology.
5. Plaintiff was, in telegram of September 20, 1938, reported not physically qualified for retention on active duty. On September 24, 1938, pursuant to Special Orders No. 231, Headquarters Third Corps Area, of that date, plaintiff was relieved from further active duty “because of physical disqualification,” so as to enable him to revert to inactive duty status on October 9,1938. He, thereupon, resumed his *489 normal civilian activities. On October 11, 1938, pursuant to Army Regulations then in effect, plaintiff was transferred to the Inactive Reserve Section of the Officers’ Reserve Corps. On October 14,1938, the Veterans’ Administration requested, and shortly thereafter received, from the War Department a summary of plaintiff’s medical record. The War Department report showed somewhat in detail the medical record of plaintiff while on active duty in 1938 and the two diagnoses referred to in above findings. Thereafter, effective October 10, 1938, plaintiff was awarded disability benefits on the basis of ten percent disability by reason of neurocir-culatory asthenia, and twenty percent disability based on arthritis, making a combined degree of disability of thirty percent.
6. Thereafter, in response to a request by the plaintiff, the Adjutant General of the Army on February 21, 1939, sent plaintiff’s personal physician a summary of plaintiff’s medical record, in which no mention was made of any diagnosis of valvular heart disease, and which concluded by saying, “In view of these facts it was believed that the evidence was insufficient to make a diagnosis of organic heart disease.” Both the plaintiff and plaintiff’s physician accordingly were justified in believing that plaintiff did not have heart disease in 1938. However, on the basis of advances in cardiology since that time, and in light of present knowledge, it appears that the 1938 diagnosis was incorrect, and that the plaintiff in fact had organic heart disease in 1938, specifically, aortic stenosis.
7. On December 16,1941, with reinstatement to active duty in view, plaintiff requested a physical examination in a letter addressed to the Commanding Officer, Third Military Area, Third Corps Area, Richmond, Virginia, as follows:
It is requested that I be given a physical examination to determine my physical fitness to be reinstated in the Active Reserve QM Corps for active duty. It is my belief that I can successfully pass a physical examination for reinstatement to the active reserve. My age is 49 yrs. 3 months. My appointment as Captain Inactive Reserve, expires 9-12-45.
8. On December 27,1941, Headquarters Third Corps Area sent plaintiff a letter reading as follows:
*490 1. In connection with your letter of December 16,1941, requesting physical examination for transfer from the Inactive Eeserve to the Quartermaster Eeserve, you are authorized to report, to a regular Army Post for a final type physical examination, and the Medical Officer in charge should be requested to forward the complete examination to this headquarters, if possible, so as to arrive not later than January 5,1942.
2. The records show that you were transferred to the Inactive Eeserve by reason of “sciatica acute, left”; “arthritis, chronic, hypertrophic” and “neurocirculatory asthenia, mild.” The medical examiner will be advised of these previous disqualifying defects.
9. At the time he received the foregoing letter, plaintiff was temporarily in Miami, Florida. Accordingly, on January 2, 1942, he presented himself for physical examination at Morrison Field, West Palm Beach, Florida, at that time an installation of the U. S. Army, turning over the original copy of said letter to the Medical Officer in charge. The Eeport of Physical Examination rendered on plaintiff, executed January 5, 1942, indicated that plaintiff was found fully qualified for active military service except for being “5 pounds under the minimum weight for age and height.” Specifically it noted that the heart and arteries were “Normal,” and that the character of the pulse was “Full and regular.”
This Eeport of Physical Examination was forwarded to Headquarters Third Corps Area for further action.
10. On January 28,1942, plaintiff made further inquiry of the Commanding Officer, Third Military Area, Third Corps Area, Eichmond, Virginia, as to the status of his application for active duty, and was advised in reply that the final type physical examination in his case had been forwarded to Headquarters Third Corps Area. Thereafter, by letter dated February 5, 1942, Headquarters Third Corps Area advised plaintiff as follows:
1. In connection with physical examination made at Morrison Field, West Palm Beach, Florida, on January 5,1942, the following indorsement from, the War Department, dated February 2, 1942, is quoted for your information and compliance.
“The attached report of physical examination is returned for amplification of history of chronic arthritis. *491 This officer was placed in the Inactive Reserve by reason of sciatica, acute, left, mild, 1938; arthritis, chronic, hypertrophic, moderate, involving the lumbar spine, sacroiliac and hip joints; neurocirculatory asthenia, mild. Information is desired as to whether or not this officer has had further complaints and symptoms referable to the back since 1938 and has been incapacitated as a result thereof; and whether or not there is limitation in motion of the above mentioned joints. It is desired that X-ray report of the lumbar spine and sacroiliac joints, and copy and report of electrocardiogram be submitted. Information is also desired as to whether or not there is evidence of organic heart disease or neuro-circulatory asthenia.”
2. It is requested that you report to the nearest Regular Army Medical Examiner for compliance with the above War Department instructions. Report should be made so as to reach this headquarters not later than February 20,1942.
3. This letter should be presented to the Medical Examiner as authority for the examination.
11. Pursuant to the foregoing instructions, plaintiff again presented himself at Morrison Field, West Palm Beach, Florida, for a further physical examination. He turned over the original letter to the medical examiner, and was examined. On February 12, 1942, plaintiff reported his status to the commanding officer, Third Military Area, Third Corps Area, Richmond, Virginia, as follows:
1. February 7, 1942 the attached War Department Instructions were received directing further information regarding medical history. In compliance with the attached instructions, I reported to Morrison Field, West Palm Beach, Florida, on February 9, 1942, but due to the fact they had not completed the setting up of their electrocardiogram machine, the supplementary examination was not completed until February 11, 1942.
2. X-rays and electrocardiogram requested by attached War Department instructions were taken. The Medical Examiner was advised by me that I have had no further complaints and symptoms referable to the back since 1938; and that since then I have experienced nothing to indicate symptoms; limitations of joint motion, or incapacitation referable to the reasons for which it is stated I was placed in the Inactive Reserve during October 1938. Further, during the period I have been active, in my work having driven automobiles an aver *492 age of 35,000 miles per year, making 15 to 20 commercial calls per day five to six days per week, and personally keeping records, preparing reports, etc., of some 4,000 customers and prospective customers, also preparing my own working plans for the coverage of the five southeastern seaboard states.
12. On February 14,1942, the medical examiner at Morrison Field returned the communication set out in finding 10, by indorsement reading as follows:
1. Physical examination Form WD AGO 63 was not returned.
2. This officer does not give a history of any symptoms by reason of sciatica in 1938. X-ray reveals no evidence of chronic hypertrophic arthritis involving lumbar spine or sacroiliac joints. There is slight change in head of femur on right but this is nonsymptomatic and there is no limitation of motion. There is no evidence of organic heart disease or neurocirculatory asthenia. The E. K. G. which is attached is normal.
The initials “E. K. G.” in the foregoing indorsement mean “electrocardiogram.” Accompanying this indorsement were copies of the electrocardiogram reading and of the radiologic report, the former being indorsed “Within normal variations.” All of this correspondence was forwarded by the plaintiff on February 18, 1942, to the Third Military Area, Third Corps Area, Richmond, Virginia. Eventually it reached Headquarters Third Corps Area, and thereafter, the War Department.
13. Thereafter, by order of the Secretary of War, the Adjutant General’s Office, War Department, on March 13, 1942, addressed the following letter to the Commanding General, Third Corps Area:
1. Reference is made to your eighth indorsement of February 24,1942, forwarding report of physical examination, dated January 5,1942, of Captain William Jefferson Loth, Jr., Inactive Reserve (0-151636). The physical defects of arthritis, chronic, lumbar spine, sacroiliac and hip joints, neurocirculatory asthenia and history of acute sciatica, left, 1938, are noted.
2. Waiver of the above noted defects is authorized for extended active duty. Captain Loth will be retained in the Inactive Reserve with eligibility for active duty.
*493 This communication was forwarded to the plaintiff, who on March 19, 1942, replied by indorsement in pertinent part as follows:
2. If further application for active duty is necessary, I make this application for active duty, as I am available for immediate call only needing ten to fifteen days to outfit myself with necessary uniforms and arrange a few personal affairs.
14. By Special Orders No. 73, Headquarters Third Corps Area, dated March 26, 1942, plaintiff was ordered to extended active duty with the Quartermaster Corps at Fort Monroe, Virginia, effective April 4, 1942. These orders noted that plaintiff was “physically qualified.” On March 28,1942, the Report of Physical Examination made at Morrison Field, referred to in finding 9, was indorsed by Headquarters Third Corps Area to the Adjutant General as follows: “This Reserve Officer * * * is physically qualified.” At that time it was the practice of the War Department, when officers of the Inactive Reserve were found not physically qualified for general military duty but physically qualified only for limited duty, to order such officers to extended active duty with a notation that they were “physically qualified for duty in a LIMITED SERVICE capacity only.”
15. At the time plaintiff received a copy of said Special Orders No. 73, he for the first time received a copy of the Report of Physical Examination executed at Morrison Field, West Palm Beach, Florida. Thereupon, on April 3, 1942, plaintiff sent the following letter to the Commanding General, Third Corps Area:
1. Attention is directed to the Official Copy Form. WD AGO 63 Physical Examination, original of which was executed at Morrison Field, West Palm Beach, Florida, January 5, 1942. This physical examination was-not seen by me until I returned to my home at Waynes-boro, Va., April 2,1942, where I found the attached copy which was postmarked Baltimore, Maryland, March 30,. 1942.
2. Upon checking over the answers to questions it appears that answers to question 13 Height and question. 28 pension, disability allowance, or compensation or-retired pay from the XL S. Government are not answered correctly. The question 13 Height is given in the *494 attached copy as 68% inches, this is incorrect as my height is 66 inches. This would make my weight conform to minimum requirements for my height. The answer to question 28 stating that I stated that I was not drawing a disability allowance, etc., is also incorrect either by error of copy or by assumption. The correct answer to this question is that I am drawing disability allowance for the disabilities which placed me in the Inactive Reserve from active duty in 1938.
3. For your information, the Veterans Administration granted me disability compensation upon the medical record from Walter Reed Hospital. Until I was examined January 5,1942,1 had had no medical examination between those at Walter Reed Hospital in 1938 and the one, given my [sic] at Morrison Field, West Palm Beach, Florida. My Claim Number with the Veterans’ Administration is C-2744325.
4. I bring up the above to correct the record and it is presumed that since physical defects for which I was placed in the Inactive Reserve in 1938 have been waived with eligibility for active duty the disability compensation would automatically be discontinued on my call to active duty. The failure of this information to be stated correctly on the Report of Physical Examination of January 5, 1942, is as stated above in paragraph 2 and since I did not see the completed Report until April 2, 1942,1 did not know of the negative answer to the question recorded on the Report of Physical Examination.
IS. The Commanding General, Third Corps Area, by first indorsement, dated April 7,1942, advised plaintiff as follows:
With reference to the inquiry contained in basic communication concerning disability allowance while on active duty, you are advised that officers on active duty are required to relinquish their claim to such allowance immediately upon entering on active duty. It is considered advisable that you contact your local Finance Officer informing him that you desire to relinquish your claim to the disability allowance now being received by you.
Plaintiff thereupon wrote to the finance officer at Fort Monroe, Virginia, on April 10,1942, as follows:
Attention is invited to first indorsement and enclosed copy of letter to the Veterans Administration, submitted under date of April 4,1942, advising of active duty with the Army and requesting disability compensation be discontinued.
*495 Plaintiff enclosed with this indorsement a copy of the following letter which he had earlier written the Veterans’ Administration:
Post Office Box 613,
Waynesboro, Virginia,
April 4,1942.
VETERANS’ ADMINISTRATION,

Washington, D. C.

Eeference: C-2744325
William Jefferson Loth, Jr.
Gentlemen : I have been ordered to active duty with the Army effective this date.
It is requested that the disability compensation paid me, be discontinued since I have been found physically qualified for active duty by the Army.
William Jefferson Loth, Jr.,

Captain, Quartermaster Corps.

17. By third indorsement dated April 10,1942, the finance officer at Port Monroe, Virginia, replied to the plaintiff as follows :
Noted. Apparently the submission of letter dated April 4,1942, will effect the necessary adjustment in connection with compensation to be paid you while on active duty.
18. Plaintiff’s service with the Army was creditable, and on October 21,1942, he was promoted to the grade of major in the Quartermaster Corps. Plaintiff’s only illness until the spring of 1945 was an attack of virus pneumonia in October 1942. In May 1945, plaintiff suffered a heart attack, in respect of which he was examined on May 14,1945, by a board of three medical officers at the Station Hospital, Port Monroe, Virginia. This board’s conclusions were: “EKG Interpretations : Suggestive of Myocardial damage — with mild left axis deviations — probably due to arteriosclerosis. Heart: Harsh, systolic, basal murmur maximal at A2 and radiating upward. Thrill present. Impression: Aortic stenosis probably in sclerotic basis, limited service within continental limits of h. s.” The board also noted “Arteries: Mod. Sclerotic.” In consequence of this diagnosis, plaintiff was placed on limited service, and was, by orders dated October 2, 1945, transferred to the Eegional Hospital at *496 Camp Lee, Virginia, for observation, treatment, and appearance before a disposition board.
19. Following hospitalization, a disposition board at the ASF Eegional Hospital, Camp Lee, Virginia, in November and December 1945, diagnosed plaintiff’s illness as follows:
1. Valvular heart disease, aortic stenosis, moderate with aortic and mitral valvular incompetence, cause unknown.
2. Arteriosclerosis, generalized, central and peripheral, moderately severe, cause unknown.
The disposition board ascribed line of duty status to both ailments, and recommended that he appear before an Army retiring board with a view to retirement. The disposition board’s proceedings note:
* * * . In the fall of 1944 the patient states that he noticed the onset of intermittent precordial pains which occurred at rest, were never severe, varied from sharp pain to a dull ache, and never radiated. The pain at that time never lasted more than two to three minutes at a time but he now states that the pain occurs more frequently and lasts for a longer period of time, lasting on an average of about 15 minutes at present. During the month or six weeks previous to admission to the hospital the patient was having pains every day. Patient states that he has had shortness of breath on climbing stairs and walking fast, noticeable to him since May 1945. * * *
20. Plaintiff appeared before an Army retiring board at Camp Lee, Virginia, on January 22,1946. That board heard evidence, which may be summarized as follows:
Plaintiff was asked for a statement of his military service to which he replied: “Came on active duty as a captain 4 April 1942. Promoted 21 October 1942 to major. I have no overseas service.” Plaintiff stated further that he did not know when his heart trouble began, but that initial symptoms of pain in the chest occurred soon after he went through an infiltration course. Both medical witnesses stated that in their opinion plaintiff’s disabilities had existed prior to service, but that these disabilities had been aggravated by service and hence were incurred in line of duty.
After having heard evidence, the board made the following findings:
*497 a. Officer is permanently incapacitated for active service.
b. Incapacity is the result of an incident of commissioned service.
c. Cause of said incapacity is: (1) Valvular heart disease, aortic stenosis, moderate with aortic and mitral valvular incompetence, cause unknown. (2) Arteriosclerosis, generalized, central and peripheral, moderately severe, cause unknown.
d. Cause of said incapacity is an incident of commissioned service.
e. Incapacity had its origin on or about 14 May 1945.
f. Said incapacity is permanent.
21. Following his appearance before the Army Retiring Board, plaintiff was granted leave and ordered home, and was ordered relieved from active duty and to revert to inactive status as of April 22, 1946, by reason of physical disability.
22. By letter dated March 22, 1946, plaintiff was notified by the Adjutant General’s Office of the War Department that, upon review of the foregoing Army Retiring Board proceedings, it had been decided that action on that board’s findings should be held in abeyance, and that plaintiff should be ordered to Walter Reed General Hospital, Army Medical Center, Washington, D. C., for further observation and treatment. Plaintiff consented to his recall to active duty for such purposes although at the time he was at his home on terminal leave. Plaintiff’s terminal leave was terminated, and he was ordered to, and did, proceed to Walter Reed General Hospital on April 22,1946, for further observations and treatment.
23. When admitted, plaintiff was in a semicomatose state and while he could be aroused, he was unable to answer questions, in consequence of an attempt at suicide by taking ten to twenty seconal tablets. During his stay at the hospital, he showed gradual improvement, but it was necessary to reassure him constantly regarding his cardiac condition, and he expressed some concern for the future. He appeared before a disposition board on June 10, 1946. This board noted that the patient stated that at the time he reentered active military duty there was some question regarding his fitness from a standpoint of heart disease as an electrocardio *498 gram and X-ray were requested at that time. The disposition board diagnosed plaintiff’s disabilities as follows:
1. Valvular disease, aortic stenosis and insufficiency, mitral insufficiency, moderate, cause undetermined; unchanged. LOD: Yes.
2. Neurotic depressive reaction, chronic, severe, with involutional features, manifested by despondency, retardation, and abortive suicidal thoughts; improved. LOD: Yes.
[LOD means: incurred in line of duty.]
The disposition board accordingly recommended that plaintiff appear before an Army retiring board.
24. Plaintiff was again examined physically on June 20, 1946, by Colonel Taylor, a cardiologist, and Captain Cassino, a neuropsychiatrist. The report of their physical examination stated, referring to the plaintiff, “He stated that at the time he reentered active military duty there was some question regarding his fitness from a standpoint of heart disease as an electrocardiogram and X-ray were requested at that time.” The medical examiners’ conclusions were: “This officer is incapacitated for active military service; the said incapacity is the result of an incident of the service; the said causes of the incapacity are: 1. Valvular disease, aortic stenosis and insufficiency, mitral insufficiency, moderate, cause undetermined; 2. Neurotic depressive reaction, chronic, severe, with involutional features, manifested by despondency, retardation, and abortive suicidal thoughts; the said cause is an incident of the service; the said cause No. 1 originated in the fall of 1944 and No. 2 in December 1945; and said incapacity is permanent.” The medical examiners added, with respect to these diagnoses, “1. Disabling, line of duty: Yes. 2. Partially disabling, line of duty: Yes.”
25. On July 9, 1946, plaintiff appeared at Walter Eeed General Hospital before a new Army retiring board. That board, after having had the report of medical examination referred to in finding 24 read to them, and, after hearing the evidence of the plaintiff, Colonel Taylor and Captain Cassino found that plaintiff was permanently incapacitated for active military service because of (1) valvular heart disease, aortic stenosis and insufficiency, mitral insufficiency, moderate, cause undetermined; (2) neurotic depressive reac *499 tion, chronic, severe with involutional features, manifested by despondency, retardation and abortive suicidal thoughts.
This retiring board further found that the causes of the two quoted disorders were incidents of plaintiff’s military service, that such causes were not aggravated by military service, and that plaintiff’s incapacity for active service was the result of an incident of service. Thereafter, pursuant to paragraph 12, Special Orders No. 190, Army Medical Center, •dated July 10, 1946, plaintiff was relieved from further observation and treatment at Walter Eeed General Hospital, and reverted to terminal leave status.
26. The findings of this Army retiring board were approved on September 26,1946. Thereafter, under date of October 2,1946, plaintiff was notified by the Adjutant General’s Office, War Department, that he was as of that date being certified to the Administrator of Veterans’ Affairs under the provisions of the act of April 3,1939, for retirement pay in the amount of $306.25 monthly, effective April 23, 1946, and in the amount of $336.88 monthly from July 1,1946. This notification was amended by a similar letter, dated April 11, 1947, to the effect that plaintiff was being certified for retirement pay in the amount of $336.88 monthly, effective July 24,1946, instead of in the amounts previously indicated.
During the consideration of this case in 1945 and 1946, the fact that, while on active duty with the Civilian Conservation Corps, plaintiff had been under treatment at Walter Eeed Hospital from May 31 to September 1, 1938 was not known by the disposition boards or the Army retiring boards, nor were they aware of the difference of opinion of the medical officers as to plaintiff’s heart condition while under treatment in Walter Eeed in 1938.
27. On May 8, 1947, the Veterans’ Administration sent a letter to the Adjutant General’s Office regarding the plaintiff, which communication in pertinent part read as follows:
The subject veteran filed a claim for compensation with this administration on October 3,1938, based on his •service in the United States Army from April 15, 1938, to October 9, 1938. His claim was considered by the rating agency of this administration on January 7,1939, ■and based on the evidence of record in his claim file he was considered ten percent disabled from October 10, *500 1938, based on bis disability diagnosed as Neurocireula-torjr asthenia, mild, which was shown to [sic] aggravated during his service and twenty percent disabled from October 10, 1938 by reason of his disability diagnosed as Arthritis, chronic, multiple, moderate. These findings entitled the veteran to a combined degree of disability of thirty percent effective October 10, 1938.
A physical examination has not been conducted of the veteran by this administration. The above findings-were based on records received from the War Department.
A typed, true copy of these records is enclosed pursuant to your request.
28. On June 10, 1947, the foregoing letter, with its enclosures, was forwarded by the Adjutant General to the Surgeon General, United States Army, together with plaintiff’s-AG 201 file from the Adjutant General’s Office, which contained the personnel actions relating to the plaintiff on file in that office. The latter file did not then contain the first two communications referred to in finding 10, nor the letter from the Adjutant General which is quoted in finding 13, nor any of the communications quoted in findings 15,16, and 17. All of the papers mentioned in the first sentence of the present finding came to the desk of Lieutenant Colonel Eugene C. Jacobs, Medical Corps, who was then on duty in the Retirement Branch, Physical Standards Division, Surgeon General’s office. This officer did not see any of plaintiff’s letters,, above referred to, and had no independent knowledge of the facts reflected therein. He did not send for plaintiff’s field 201 files nor for the original records of plaintiff’s 1938 hospitalization. Lieutenant Colonel Jacobs was not a cardiologist and, when called as a witness on behalf of the defendant before the commissioner, declined to answer questions as to-the differential diagnosis of organic heart disease and neuro-circulatory asthenia on the ground that he was not qualified to do so. At this time the Chief, Physical Standards Division, Surgeon General’s office, was Colonel Arthur H. Nylen,, a general practitioner, and not a cardiologist, who at this time had neither treated nor prescribed for patients in the 7 or 8 years preceding 1947, and who, testifying as a witness for the defendant, similarly declined to state how to distin *501 guish. between neurocirculatory asthenia and organic heart disease.
29. On June IB, 1947, Lieutenant Colonel Jacobs prepared the following communication:
1. War Department records, including letter from Veterans’ Administration, 8 May 1947, with inclosures, and AG 201 File, in the case of Capt. William J. Loth, Jr., 0-151636, AUS, have been carefully reviewed in this office.
2. The latest evidence in the record reveals that the officer had valvular heart disease diagnosed at Walter Reed General Hospital in 1938 while on CCC duty _LOD_No._EPTS at that time.
3. There is evidence of apparent fraud in that officer failed to reveal the duration of his heart disease and that he was receiving 30% pension from VA, beginning October 1938, when asked duration of his disability.
4. Recommend that this case be reopened.
This communication was signed “For the Surgeon General” by the Chief, Retirement Branch, Physical Standards Division, who was authorized to sign it on behalf of the Surgeon General, and was despatched to the Adjutant General, United States Army. Lieutenant Colonel Jacobs’ preparation of the quoted communication without sending for the field 201 files relating to the plaintiff or for the originals of the War Department medical records bearing on plaintiff’s 1938 hospitalization was a departure from the policies of the Physical Standards Division, Surgeon General’s office, as was his failure to mention in that communication the change in the diagnosis of plaintiff’s condition that had been made in 1938.
30. The file in plaintiff’s case was thereupon referred to the Secretary of War’s Personnel Board, which on July 8,1947, wrote the Adjutant General as follows:
1. It is the opinion of the Secretary of War’s Personnel Board that had the complete medical records pertaining to the subject officer been available to the Army Retiring Board held at Walter Reed General Hospital on 9 July 1946, the findings of that board might have been materially affected.
_ 2. The Secretary of War directs: That the Army Retiring Board proceedings dated 9 July 1946 be disapproved; that subject officer be ordered to appear, with his consent, before a new Army Retiring Board at a General Hospital nearest his home; that the available *502 records pertaining to subject officer’s medical history be made available to such board.
For the President, Secretary of War’s Personnel Board:
J. K. Haddick,
Major, GAV,

Asst. Recorder.

On the same day the following memorandum was signed as indicated and placed in plaintiff’s AG 201 file:
AG 201-Loth, William J. Jr.
8 July 1947
Approval of Findings of Army Eetiring Board dated 25 September 1946, in the case of Major William J. Loth, Jr., 0151636, Army of the United States, is rescinded. The findings of the Eetiring Board are hereby disapproved.
By order oe the Secretary of War :
(S) H. W. Thompson,

Adjutant General.

There is no evidence showing or tending to show that any of the foregoing matters were ever brought to the personal attention of the Secretary of War, or that he personally directed the action of rescission and disapproval.
31. Thereafter, the following notation was made in plaintiff’s file on July 8, 1947: “Approval of findings of A. E. B. 25 Sept. 1946 * * * is rescinded.” Two days later, on July 10, 1947, the Adjutant General’s office, War Department, without further communication to the plaintiff, wrote him as follows:
1. Eeference is made to War Department letter dated 2 October 1946 wherein you were notified that you were being certified to the Administrator of Veterans’ Affairs for retirement pay benefits.
2. Additional evidence, which was not available for consideration by the Eetiring Board nor the War Department'during its initial review of the Eetiring Board, has recently come to light. It has been determined that if this evidence had been available to the Eetiring Board and to the War Department, the findings of the Board and the War Department action would have been materially influenced thereby.
3. Accordingly, the Secretary of War has directed that the findings of the Army Eetiring Board be dis *503 approved. You are therefore not entitled to retirement pay benefits. However, in fairness to you, you are hereby tendered the opportunity of being recalled to active duty at Walter Reed General Hospital, Washington, D. C. for appearance before a new Army Retiring Board.
4. In the event you do not desire to be recalled to active duty for the above purpose, you may be authorized to enter Walter Reed General Hospital at your own expense. If you do not desire either alternative, the War Department will take no further action on your case.
32. Plaintiff replied on July 15,1947, as follows: “In this connection, information relative to the additional evidence that has recently come to light would perhaps facilitate my decision. Therefore it is requested that the nature of this additional evidence be furnished to me, if possible.”
33. On July 23, 1947, the War Department replied to plaintiff, in pertinent part as follows:
2. The additional information which was not available to the Army Retiring Board nor to the War Department at the time your case was reviewed, indicated that you were serving with the Civilian Conservation Corps upon admittance to Walter Reed General Hospital 31 May 1938, with diagnosis of 1. Sciatica, acute, left, mild, cause undetermined. 2. Arthritis, chronic, hypertrophic, moderate, involving lumbar spine, sacroiliac and hip joints, bilateral, cause undetermined. 3. Yalvular heart disease, mitral stenosis and regurgitation, rheumatic in origin. Diagnosis #3 was changed on 20 July 1938, to read-Neurocircula-tory Asthenia, mild, cause undetermined. Existed prior to entrance on active duty. Not in line of duty. Diagnosis #1 in line of duty. #2 and 3 not in line of duty, existed prior to entry on active duty.
3. Officers who incur disabilities while on active duty with the Civilian Conservation Corps are not eligible for retirement pay under the provisions of the Act of 3 April 1939, inasmuch as such individuals are specifically excluded from that Act.[1]
34. Plaintiff, through counsel, in letters dated April 6, June 11, and July 14, 1948, addressed to the Secretary of *504 the Army, requested that the revocation of his certification of entitlement to retirement pay benefits be withdrawn, and that he be reinstated as fully entitled to such retirement pay. In the letter last mentioned, plaintiff’s counsel forwarded to the Adjutant General copies of the letters, referred to in finding 28, which were not then in the Department of the Army files. On September 27,1948, the Adjutant General, United States Army, refused this request in writing, stating in part as follows:
The Judge Advocate General, after carefully reviewing Major Loth’s entire record, including your letters of 6 April, 11 June, and 14 July 1948, with inclosures, has reaffirmed the long established policy of the Department that “a certification of entitlement to retirement pay benefits to the Administrator of Veterans’ Affairs may be set aside and the matter reopened for further consideration whenever it appears from newly discovered substantial evidence that the retiring board might reasonably have reached a different finding had that evidence been before it.”
Following the certification of Major Loth to the Veterans’ Administration for retirement pay benefits information was received by this office from that agency, as you know, regarding this officer’s hospitalization in 1938 for a similar condition. Based upon a thorough review of the complete file, including the additional information and records not previously considered, it was determined by the Department that had this additional information been available for consideration by the Army retiring board and the reviewing authorities different findings might reasonably have been reached to the effect that this officer is not eligible to receive retirement pay benefits under existing law. Accordingly, the actions of the Department reopening the case, disapproving the findings of the Army retiring board and notifying the Administrator of Veterans’ Affairs that the certification was thereby revoked were justified.
Major Loth’s entire record has again been carefully reviewed in the Office of The Surgeon General resulting in the expressed view that he is permanently incapacitated for active service by reason of valvular heart disease but that this incapacity resulted from a natural progression of a defect which antedated his entrance on active duty in World War II (4 April 1942) and, consequently, is not the result of an incident of the service. *505 This medical opinion is based on information in the records of the findings of both X-ray study and electrocardiogram and clinical record history disclosing symptoms and conditions occurring prior to the period of active duty in question, all of which are significant and compatible with the resultant incapacity of valvular heart disease.
In view of the foregoing and inasmuch as actions of the Department to date have left two matters undecided, viz., first, no Army retiring board has considered this case from the standpoint of possible aggravation of Major Loth’s heart disease by World War II service, and second, final evaluation has not been made regarding the second condition found to exist by the Army retiring board of 9 July 1946, this office again advises that Major Loth may, if he so desires, be authorized to enter Walter Eeed General Hospital, Washington, D. C., for further observation, necessary treatment, appearance before a disposition board and, if indicated, before a new Army retiring board. Such hospitalization must be in a civilian status at no expense to the Government as the recall to active duty of officers for the purpose of physical evaluation has been discontinued by virtue of a decision rendered by the Comptroller General to the effect that such officers are not on active duty within the law so as to become entitled to active duty pay and allowances. It is suggested that Major Loth be advised to notify this office at an early date of his desire in the matter. In the event he does not wish to accept this opportunity for further consideration of his case, no further action can be initiated by the Department. This, however, will not preclude his right to request a review of his case by the Army Disability Eeview Board functioning under the provisions of Section 302, Public Law 346, 78th Congress, as amended. Under this law such a review may be requested at any time within 15 years from the date of the act (22 June 1944) or the date of relief from active duty, whichever is later. The appropriate forms for this purpose are inclosed for Major Loth’s convenience.
35. If plaintiff had appeared before a new Army retiring board, the proceedings of such new board would have been reviewed in the Eetirement Branch, Physical Standards Division, Surgeon General’s office, under the standards and policies by which that branch was guided, and action thereon *506 would have been taken by the Chief of that Branch in the name of the Surgeon General. Plaintiff did not elect to appear before another Army retiring board, nor before any other board in the Department of the Army, but instead brought the present proceeding on October 6, 1950.
Plaintiff’s death certificate recites as the disease or condition directly relating to his death on April 9, 1953, “Heart disease, chronic valvular,” of many years duration; and an antecedent cause of “Involutional Psyc[h]otic Reaction (depressed type),” of 130 days’ duration prior to death.
36. After July 10,1947, defendant, acting through the Veterans’ Administration, and proceding on the basis that plaintiff Avas disentitled to retirement benefits ab initio, called upon plaintiff to return all retirement benefits theretofore paid. Defendant also withheld payments due to the plaintiff in respect of dividends on life insurance policies as alleged setoffs against its purported claim against the plaintiff.
37. The parties have stipulated that, if plaintiff’s executors are entitled to recover any amount in this proceeding, the amount of such recovery is subject to calculation by the General Accounting Office, without prejudice to the right of either party to controvert the accuracy of such findings.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover.
The entry of judgment is suspended until the incoming of a report from the General Accounting Office showing the amount due, computed in accordance with this opinion and the stipulation of the parties.
In accordance with the opinion of the court and on a report by the General Accounting Office showing the amount due thereunder, it was ordered June 5,1956, that judgment for the plaintiff be entered for $21,680.83.

 Service in the Civilian Conservation! Corps was excluded by amendment of July 25,1939, 53 Stat 1079.